UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

**LATASHA WILSON,**
2159 N. 41st St.
Milwaukee, WI 53208

    **Plaintiff**,

Vs                                              **CASE NO.** 20-1893

**DAVISON,**
a/k/a Davison Design and Development, Inc.
RIDC Park
595 Alpha Dr.
Pittsburgh, PA 15238-2911

    **Defendant.**

## COMPLAINT

**NOW COMES** the Plaintiff, Latasha Wilson, by and through her attorneys, Attorney Briane F. Pagel and Lawton & Cates, S.C., and as and for a complaint alleges as follows:

1. Plaintiff Latasha Wilson is a Wisconsin citizen residing at 2159 N. 41st St., Milwaukee, WI 53208.

2. Defendant Davison is a Pittsburgh, Pennsylvania-located corporation with its principal place of business located at 595 Alpha Drive, RIDC Park, Pittsburgh, PA 15238-2911. Davison is also known as "Davison Design and Development."

3. This action is brought to enforce rights under a federal law, as set out further herein, and this Court accordingly has jurisdiction over the case pursuant to 28 USC §1331. Because the state law claims asserted herein arise out of the same facts and transactions, this Court has supplemental jurisdiction over those claims pursuant to 28 USC §1367.

1

4. In or about 2017, plaintiff Wilson became interested in marketing a body cream she had invented. Wilson became aware of Davison through online searches and reviewing their website.

5. Wilson submitted information about her cream to Davison through an online submission form, after which she was contacted by Davison.

6. At all material times hereto, contacts between Wilson and Davison were through phone or email only; Wilson does not recall and upon information and belief did not receive any information through the US Mail or other physical delivery.

7. In response to Wilson's website submission, on January 25, 2017, Wilson received an email from Davison which said (in part):

> **On Wednesday, January 25, 2017, 4:04 PM, Hasan Walker <walker.hasan@davison.com> wrote:**
> Hi Latasha,
> I thought you might like seeing some our products that have sold on store shelves around the country. For years, we have helped idea people like you take an idea and turn it into something real. ***That is the Davison difference and proof of our Better Way to invent can be found on store shelves all across the country***.

(Emphasis added)

8. On January 26, 2017, Wilson, after speaking with Davison and reviewing their emails, paid $695 for a "Pre-Development Agreement R&D."

9. On January 31, 2017, Davison emailed Wilson telling her that Davison would file her patent application for her, and included instructions on how to do so.

10. In February 2017, Davison again solicited Wilson to use their services, this time suggesting that she use her tax return to pay for the program. This email used identical language to the January 25, 2017 email.

11. On March 15, 2017, Davison emailed to Wilson a proposed agreement. A copy of that agreement is filed with this complaint as **Exhibit A.** This agreement was referred to as the "Special Custom Agreement."

12. The Special Custom Agreement required Wilson to pay $5,850 in exchange for Davison preparing packaging and a sample production page.

13. On March 20, 2017, Wilson paid $5,265 to enter into the Special Custom Agreement. Davison then discounted the remainder of the price so Wilson had paid everything required of her under the Special Custom Agreement.

14. Wilson and employees of Davison then exchanged phone calls to discuss the product.

15. On October 11, 2017, Wilson had still not received any information that showed Davison had complied with its obligations under the Special Custom Agreement. Instead, by email, Davison offered Wilson a second contract, suggesting that she pay for an "Inventomercial." The "Inventomercial" proposed contract is filed with this complaint as **Exhibit B.**

16. The Inventomercial contract promised that Davison would produce a video to be used in soliciting companies to license Wilson's product.

17. Wilson paid $2,495 to Davison to produce the Inventomercial.

18. On or about November 17, 2017, Davison for the first time provided Wilson the materials she had paid $5,265 for in March 2017. These materials were called an "Executive Package," and are filed with this complaint as **Exhibit C.** These documents were a one-page picture and brief ad copy, plus a disc that would not play on Wilson's computer, and a blank patent application that Wilson was now – contrary to Davison's earlier emails – required to fill out and file on her own.

19. Thereafter, Wilson received 'project files' from Davison on January 4, 2018 and October 22, 2018. These were identical to the materials already received.

20. On Wednesday, October 31, 2018, Davison solicited Wilson to enter into a "Multiple Company Campaign service agreement in which it said it would contact "up to 45 companies" in a year with a "confidential teaser" to attempt to interest those companies in her product. The cost of that agreement was said to be $6,995, but Davison said it would be reduced to $3,000 for a short time. Davison also represented in that email that it ordinarily charged $395 to present an idea to a single company, and thus that 45 companies could result in Wilson being charged "over $17,000."

21. On November 1 2018, Wilson emailed Davison twice, saying that she felt she had been scammed: video was poorly produced, product looked dirty in ad. In response, Davison's employees said that Wilson should call them.

22. On November 3, 2018, Davison sent an email saying that the Multiple Company Campaign proposed agreement might expire and suggested that Wilson give a $100 deposit to hold the offer.

23. On November 14, 2018, Davison sent an email saying Wilson herself could list the companies she wanted them to contact and provide contact information for someone who could decide to buy a new product, suggesting that she research those companies on the internet.

24. On December 6 2018, Davison offered Wilson a coupon for the Multiple Company Marketing proposal. Wilson replied to ask whether that coupon would apply to amounts she had already paid. In response, Davison said "no you got way more than that 😊"

[SIC], presumably saying that Wilson had already received services greater than those offered in the Multiple Company Marketing proposal.

25. In July, 2019, Davison offered a new "production quote agreement," suggesting that it would reduce the allegedly regular price of $4,195 to a different number.

26. After Wilson had entered into the agreements with Davison, Davison said it would begin marketing her products to companies for licensing, in hopes that they would do so and Wilson would be paid "royalties."

27. Davison said that they would contact her every time a company said it would work with her or license her product.

28. Davison never called Wilson at any time to say that a company had shown an interest in her product or wanted to license it or work with her.

29. Wilson would instead receive phone calls from Davison every 2-3 months. In these phone calls, Davison employees would tell Wilson that they were waiting on a company or companies to call back about Wilson's product, directly saying and implying that they had sent solicitation letters or similar correspondence to companies.

30. Wilson never saw any correspondence – physical or electronic – sent to any company by Davison on her behalf, and to date has never been provided any proof that Davison solicited a single company on her behalf.

31. In October 2020, Wilson received a phone call from Davison in which an employee told her that her "last campaign" was done. The "campaign" was to have sent information about the product to various companies. Wilson never saw any proof that any information was sent to any companies for this "last campaign."

32. Davison during the time it worked with Wilson provided her with proposed letters that it said it would send to prospective licensees of Wilson's product. These letters included grammatical, spelling, and capitalization errors. The letters promised that Davison had entered into agreements to send product proposals to three companies and suggested that Davison would contact numerous other companies to enter into similar agreements.

33. In all, Wilson paid $8,205.50 to Davison, and in return received what she considered to be a subpar marketing page and product video, and has never received any proof that Davison actually sent those materials to any company on her behalf. Wilson's cream was never licensed by any company and does not appear on any store shelves anywhere in the country.

### FIRST CAUSE OF ACTION:
### VIOLATION OF THE AMERICAN INVESTORS PROTECTION ACT.

34. Reallege and incorporate the foregoing as though set forth fully at this point.

35. Davison offered to attempt to procure for Wilson a business entity which would develop and market products for Wilson's cream.

36. Prior to entering into a contract with Wilson, Davison did not provide Wilson with

    a. Any information which told Wilson the number of inventions Davison had evaluated for commercial potential in the past five years, or

    b. Any information showing the number of inventions it had provided positive and negative evaluations, or

    c. The total number of customers who contracted with Davison in the past five years, or

    d. The total number of customers who received a net financial profit as a direct result of Davison's services, or

e. The total number of customers who received license agreements for their inventions as a direct result of Davison's services.

37. Had Wilson been provided the information listed in pars. 37a-37e, she would not have entered into a contract with Davison and would not have given Davison $8,205.50 for its supposed services.

38. Wilson has thus been damaged by the failure to provide required disclosures.

39. Wilson further believed Davison's representation that "***proof of [Davison's] Better Way to invent can be found on store shelves all across the country***" and would not have invested her money with Davison without that representation.

40. Although Davison in some communications attempted to provide a disclaimer, that disclaimer was sometimes obscured by being in lighter type and hidden below addresses and phone numbers where a customer would not be likely to notice it, as in this February 14, 2017 email:



While at other times, the disclaimer was well below the representations and at the end of the email. The disclaimer also is vague and does not tell customers or potential customers that their invention would be a "typical client invention."

41. Any disclaimers are also buried in the language of the contract.

42. Wilson relied on the specific representations Davison made that its services had resulted in products being on store shelves across the country, and the vague and hard-to-notice disclaimers did not provide any reason to think that Davison would not be able to use its methods to put her product on store shelves across the country. Had Wilson been provided with the actual statistics of Davison's lack of success as required by federal law, Wilson would not have signed a contract with Davison or paid them money.

43. Davison is well aware of the requirements of the federal law, as it has been in effect for at least twenty years, and Davison has faced lawsuits and legal enforcement actions over the

8

required disclosures. Accordingly, Davison intentionally omitted the required information from Wilson, and Davison's history of violations together with that intentional action will allow the Court to award Davison three times her damages.

## SECOND CAUSE OF ACTION:
## MISREPRESENTATION:

44. Reallege and incorporate the foregoing as though set forth fully at this point.

45. Davison directly represented that its methods resulted in products on store shelves across the country. Upon information and belief, that representation was misleading and false.

46. Davison also had a duty to disclose the information set forth in paragraphs 37a-37e herein above to Wilson; Davison's failure to disclose that information constitutes a misrepresentation by omission.

47. Wilson relied on Davison's misrepresentations and misrepresentations by omission in that she contracted with Davison to promote her product, and paid them money; this reliance was to her detriment because she did not receive the services as represented.

48. Davison had a direct financial interest in these transactions, and Davison knew or should have known that it was falsely representing the value of its services by direct misrepresentation and by omission; alternatively, Davison acted intentionally in its conduct, or, alternatively, Davison acted recklessly without caring whether the information it conveyed was true or not, and without caring whether the impression it created by omission was true or not.

49. Wilson is entitled to damages for the misrepresentation. And because Davison acted intentionally and with an intentional disregard of Wilson's rights to disclosure of information, Davison is liable for punitive damages.

50. Any attempt by Davison to limit its liability for punitive damages is invalid and fails because any such contract provision in this case is unconscionable because Wilson was not given required information and because Wilson is less experienced in these matters than Davison, and because Wilson was given a contract of adhesion without opportunity to negotiate the terms, among other facts which would demonstrate such provision or provisions to be unconscionable.

### THIRD CAUSE OF ACTION: BREACH OF CONTRACT/IMPLIED DUTY OF GOOD FAITH:

51. Reallege and incorporate the foregoing as though set forth fully at this point.

52. There existed a contract or contracts between Wilson and Davison for provision of product development services and marketing of the product to potential licensors.

53. Wilson fulfilled all her obligations under the contract.

54. Davison breached the contract by failing to market Wilson's cream as agreed. Further, Davison's conduct breached the implied duty of good faith and fair dealing because Davison failed to provide Wilson with information required by federal law, Davison's production of materials fell below what a person would expect from a company that markets itself as Davison does, and Davison upon information and belief did not perform adequate attempts to license Wilson's product.

55. Wilson is entitled to damages for her breach of contract.

WHEREFORE Wilson requests the Court award her such relief as is just and equitable, including but not limited to damages, costs, and fees as allowed by law.

WILSON DEMANDS A TRIAL BY JURY ON ALL ISSUES IN THIS ACTION.

Dated: This 22nd day of December, 2020.

**Lawton & Cates, S.C.**
Attorneys for Plaintiff, Latasha Wilson
*Electronically Signed By:*

*/s/ Briane F. Pagel*
Attorney Briane F. Pagel
State Bar No. 1025514

P.O. Mailing Address:
345 W. Washington Ave. Ste. 201
P.O. Box 2965
Madison, WI 53703
P: 608.282.6200/F: 608.282.6252
bpagel@lawtoncates.com